UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ALEXANDRE LAING,

              Petitioner,

    v.

JACLYN FORTINI-LAING

           Respondent.

No. 24-cv-10901

Judge April M. Perry

## OPINION AND ORDER

Before this Court is Petitioner Alexandre Laing's complaint filed pursuant to the Convention on the Civil Aspects of International Child Abduction (the "Hague Convention") and the International Child Abductions Remedies Act ("ICARA"). Doc. 1. In that complaint, Petitioner alleges that his two minor children have been wrongfully retained in the United States by their mother, Respondent Jaclyn Fortini-Laing. Petitioner asks that this Court enter judgment in his favor establishing that the children should be returned to France. As is described below, the Court finds that Petitioner agreed that his children should remain in the United States with Respondent. The Court therefore dismisses the Petition with prejudice.

## BACKGROUND

The Court held an evidentiary hearing on January 29 and January 30, 2025, at which both Petitioner and Respondent testified. Respondent's mother, Elaine Fortini, also testified. Prior to the hearing, the parties agreed to more than fifty stipulated facts. The Court will begin with a summary of the undisputed facts[1] before turning to the contested factual issues.

### *Undisputed Facts*

Petitioner is a citizen of France and currently resides in France. Doc. 47 at 1. Respondent is a citizen of the United States and currently resides in Illinois. *Id*. Petitioner and Respondent were married on August 30, 2016. *Id*. At the beginning of their marriage, Petitioner and Respondent lived separately, with Petitioner residing in France and Respondent residing in California. *Id*. During the early part of their marriage, Petitioner came to visit Respondent in California approximately once a month. *Id*. In 2018, Petitioner moved to California to live with Respondent. *Id*.

---

[1] The undisputed facts are drawn from the stipulations and portions of the testimony where Petitioner's and Respondent's version of events was substantially the same.

In November 2018, the couple's first child was born in California. *Id.* at 2. The family resided in California until February 2019, when they moved to France. *Id*. The couple's second child was born in France in April 2021. *Id*. Both children are dual citizens of France and the United States. *Id*. Up until July 2024, the family resided in France. *Id*.

During the summer of 2024, the family planned a lengthy vacation to visit Respondent's family in the United States. *Id.* As originally planned, Respondent was to bring the children to Illinois on July 4, and Petitioner was to join the family on July 20. *Id*. The family planned a road trip around Lake Michigan, a week in the Ozarks with Respondent's extended family, and that Respondent's parents would watch the children for a few days while Petitioner and Respondent visited California as a couple. *Id*. The family had tickets to leave Illinois on August 20, returning to France on August 21. *Id*.

On June 28, Respondent received an anonymous letter informing her that Petitioner did not love her, had cheated on her multiple times, and did not want to go on the summer vacation to the United States. Ex. 23, 24. Needless to say, the letter caused significant strife between the couple.

On July 4, Respondent brought the children to Illinois as had been planned. Doc. 47 at 2. As had also been planned, Petitioner arrived in Illinois on July 20. *Id*. Respondent picked Petitioner up from the airport. *Id.* at 3. On the drive to Respondent's parents' home, Petitioner told Respondent that he wanted to take a break from their marriage or consider a divorce. *Id*. Respondent, who was at that time in the early weeks of pregnancy, did not want either a break or a divorce, and was extremely upset by Petitioner's announcement. Doc. 55 at 23; Doc. 54 at 45-47.

Despite the ongoing tension in their relationship, the family decided to go on their planned road trip around Lake Michigan. Doc. 47 at 3. They set out on July 22, and throughout the trip continued to talk about their relationship and whether their problems could be resolved (as Respondent advocated) or whether the problems were insurmountable (as Petitioner believed). On July 26, Respondent suffered a miscarriage. *Id.* On the night of the miscarriage, Respondent had an emotional breakdown; Petitioner observed her emotional distress for a time and then went to sleep. Doc. 55 at 28; Doc. 54 at 55-57.

Following the miscarriage, the couple continued the road trip. Things took another downward turn on August 1, when Petitioner reaffirmed that he wanted a separation. Doc. 55 at 32; Doc. 54 at 64. It was further decided that Petitioner was not going to be accompanying his family to the Ozarks or going on the planned trip with Respondent to California. Doc. 55 at 35; Doc. 54 at 67.

The couple returned to Respondent's parents' house in Illinois on August 2. Doc. 47 at 3. Upon their return, they had a conversation with Respondent's parents. Although much of the content of that conversation is disputed, the parties agree that by this point Petitioner had decided to return to France early, while Respondent remained with the children in the United States. Doc. 55 at 39-40; Doc. 54 at 71-72. Petitioner left for France on August 3. *Id.*

On August 6, the parties participated in a virtual couple's therapy session. Doc. 47 at 3. It did not go well. The parties had a phone call after the therapy session, during which Respondent accused Petitioner of not wanting to fix their marriage. Doc. 55 at 49-51; Doc. 54 at 74.

On August 7, Petitioner informed Respondent that he had booked three roundtrip flights from France to Chicago to visit the children. Doc. 47 at 3. The dates of those trips were August 23 to 28, 2024, October 2 to 6, 2024, and October 30 to November 4, 2024. *Id*.

On August 22, Petitioner filed a police report in France alleging that Respondent had abandoned him by not returning to France with the children on August 21. *Id*. Respondent did not know about this police report when Petitioner flew to Illinois on August 23 to see the children. *Id*. The parties met that afternoon at Panera to discuss how the visit would go. Doc. 55 at 69; Doc. 54 at 89. Respondent brought the children to see Petitioner on August 24, and the couple continued to fight. Doc. 55 at 76; Doc. 54 at 92-93. Respondent's mother brought the children to see Petitioner on August 25, but expressed her own disapproval with Petitioner. Doc. 54 at 98-99. Petitioner was not allowed to see the children on August 26, 27, or 28. Doc. 47 at 3.

Following the August trip to Illinois, Petitioner filed another police report in France, this time alleging that Respondent was preventing him from having access to the children. *Id*. Petitioner also initiated divorce proceedings in France on September 3, 2024. *Id*. Respondent initiated her own divorce proceedings in Illinois on October 3, 2024. *Id*. at 4. On October 22, 2024, Petitioner filed the instant Petition under the Hague Convention. Doc. 1. Petitioner has since returned to visit with the children from October 30 to November 4 and December 13 to 17; Petitioner saw them every day he was in Illinois. Doc. 47 at 4.

### *Disputed Facts*

Although the parties' testimony was largely consistent, there were two significant points of disagreement. First: Respondent contends that on August 1, Petitioner told Respondent that because he had made the decision to end their marriage, she would have the option of choosing where she and the children would live. Respondent further contends that she chose to stay in Illinois, and she and Petitioner had a series of conversations during which they discussed the logistics of the children living in Illinois. Second: Respondent contends that during the August 2 conversation with Respondent's parents, the parties discussed the children living in Illinois and attending school in Illinois during the upcoming school year. Given that the issue presented by this case is whether the children were wrongfully retained in Illinois or instead whether Petitioner consented to the children remaining in Illinois, the August 1 and August 2 conversations are key to the Court's ruling.

#### *Respondent's Testimony*

According to Respondent, Petitioner told her on August 1 that because it was his decision to separate, Respondent could decide whether the children should live in France or Illinois. Doc. 55 at 34. Respondent testified that she initially told Petitioner that they could go back to France, because she hoped that they would be able to fix their marital problems. *Id*. But later that day, Petitioner told Respondent that he was not going to accompany her on the planned family trip to

3

the Ozarks and did not want to go with her on the trip to California. *Id*. at 35. Based upon this, Respondent concluded that Petitioner did not really want to work on their marriage. *Id*. The couple fought, and Respondent had a panic attack and locked herself in the hotel bathroom. *Id*. at 36. According to Respondent, Petitioner took the children and left the hotel without attempting to help her. *Id*. Respondent called a mental health hotline, and the person on the phone helped her calm down. *Id*. When Petitioner returned to the hotel with the children, Respondent told him that she did not appreciate him leaving her when she was suffering and that she believed it would be best for her and the children to remain in Illinois and not return to France. *Id*. at 37.  Petitioner responded "okay." *Id*.

On August 2, the couple had a three-hour car ride back to Respondent's parents' house. *Id*. at 37. During that car ride, Respondent testified that the couple spent a lot of time discussing schools in Illinois because they had decided the children would be living in Illinois and were worried about school shootings. *Id*. at 37-38. They also discussed what extracurricular activities the children should be registered for in Illinois, how often Petitioner would visit the children, and engaging in virtual counseling. *Id*. at 38-39. Respondent testified that she was hoping they would continue to work on their marriage while living apart, much as they had done at the beginning of their marriage, and that Petitioner would join the family in Illinois when he sold his business in the next two or three years. *Id*. at 39.

Upon returning to Respondent's parents' home, the couple spoke with Respondent's parents. *Id*. According to Respondent, they told her parents that she and Petitioner had decided to separate and asked if she and the children could live with them. *Id.* at 40. Her parents agreed, and then they all discussed whether the children should go to private school or public school. *Id*. Respondent's parents favored sending the children to the same private school that Respondent had attended, but Respondent preferred sending the children to public school. *Id*. According to Respondent, Petitioner assured her parents that he would send support payments for Respondent and the children. *Id*. at 41. Following the conversation with her parents, Respondent testified that she and Petitioner told the children together "you live here now," and that they would be going to school in Illinois and not returning to France. *Id*. at 42.

Based upon what she believed was Petitioner's agreement that the children would now be living in Illinois, Respondent spent the next few weeks signing the children up for health insurance, school enrollments, and extracurricular classes near her parents' home. *Id*. at 46-47.

### *Petitioner's Testimony*

Petitioner agreed that August 1 was the day on which it was officially decided the couple would separate. Doc. 54 at 64. Petitioner similarly described the conversation in which Respondent accused him of not wanting to work on their marriage after he decided not to go to California with her, and Respondent's subsequent emotional breakdown in the bathroom. *Id*. at 66-67. Petitioner acknowledged that he left the hotel room with the children during Respondent's breakdown, and that when he returned, Respondent was calm but also angry at him for leaving her during an emotional crisis. *Id*. at 69-70. With respect to the plan going forward, Petitioner testified that he believed they were going to live in two separate apartments in France while

4

"taking a break." *Id*. at 70. Petitioner testified that there were no discussions about the children remaining in Illinois past August 20. *Id*. at 71.

As for the August 2 conversation with Respondent's parents, Petitioner testified that the conversation was solely about Petitioner and Respondent separating and Petitioner's concern about the children staying with Respondent after her emotional breakdown. *Id*. Rather than asking if the children could stay with their grandparents indefinitely, Petitioner framed the conversation as one regarding whether the children would continue to stay in Illinois through August 20. *Id*.

Petitioner testified that he left for France on August 3. *Id*. at 72. According to Petitioner, the first he heard anything about the children staying in Illinois indefinitely was following the joint therapy session on August 6. *Id*. at 74-75. According to Petitioner, Respondent was angry at him for not making an effort in therapy and told him that she was not going to come back to France. *Id*. Petitioner testified that he started panicking, but Respondent yelled that she was done listening to him, the children were staying in the United States with her, and that he needed to start planning visits if he wanted to see his children again. *Id*. at 75. According to Petitioner, he was afraid, and Respondent threatened that he could either cooperate with her or he would not see the children again. *Id*. at 76. Petitioner further testified that he did not want to be cut off from his children, so he had to "play along" by booking the flights to see the children after August 21. *Id*.

### *Other Evidence*

Apart from the testimony of Petitioner and Respondent, there is other evidence which sheds light on whether the couple agreed that the children would stay in Illinois indefinitely. First and most significantly, Respondent's mother Elaine Fortini testified at the hearing about the August 2 conversation with Petitioner and Respondent. Second, the parties conversed extensively through WhatsApp during the relevant time period and admitted into evidence more than a dozen pages of their written communications. Ex. 1. Finally, Petitioner filed legal documents in France where he summarized various aspects of their relationship. Ex. 2, Ex. 5.

The Court begins with Mrs. Fortini's testimony. According to Mrs. Fortini, after Petitioner and Respondent returned from their road trip, they had a conversation with Mrs. Fortini and her husband. Doc. 55 at 174-175. During that conversation, Petitioner told Mrs. Fortini that he and her daughter were separating and asked if Respondent and the children could stay with Mrs. Fortini and her husband. Doc. 55 at 175. Petitioner assured Mrs. Fortini that he would always support Respondent and his children financially. *Id*. Mrs. Fortini also remembered Petitioner asking her to make sure that the children ate all their vegetables. *Id*. at 177. They also spent time talking about whether the children would attend the same private school that Respondent had attended. *Id*. at 175-76. Mrs. Fortini said that she asked Petitioner repeatedly to continue with the family trip, but Petitioner refused and it "seemed like he couldn't leave fast enough the next morning." *Id*. at 176.

During the hearing, the parties admitted numerous text-based communications between them from June 28 to October 5, 2024. Ex. 1. These written conversations are often emotional

and document in real-time how Petitioner and Respondent interacted in the summer of 2024. There was also evidence of many phone calls between Petitioner and Respondent, and Petitioner and the children, of which there is of course no written transcript. Below are excerpts of what the Court concludes are the most significant written communications between the parties on the issue of whether Petitioner consented to the children remaining in Illinois after August 20.

August 6 message from Respondent to Petitioner:

> We can talk about the kids' schooling this week. They start soon. When you come in, we'll see each other, but it won't be like one family. That's gone, and I'll never understand why. But I love you with my whole heart.

August 7 response from Petitioner to Respondent:

> Thanks for these last words. I know it's hard for you to say these things because, in your view, it means putting yourself in a position to be rejected or 'humiliated.' … Let me know if you want to talk today about the children's school.

August 8 message from Respondent to Petitioner:

> Okay, so there's a preschool Tuesday and Thursday mornings near my parents' house that comes highly recommended. He would be learning things. Tuition would be $219 USD per month. The other days, he would be with my mom. I talked to him about it, and he seems interested. I'm going to confirm with him one more time that he wants to go to school, and then send in the form today. They have one spot available.

> For [older child], my cousin works on the schools, and shootings are primarily in high crime areas. However, random shootings by crazy people that happen rarely are primarily in majority-white schools because white people are crazy. There are fewer shootings in private schools because there are fewer private schools, but also because of smaller numbers of students and better families. However, Plainfield's schools are highly rated for education and teacher quality. And public school would have fewer white people. I will most likely send him to the local kindergarten. Then next year, when we leave my parents' house, I may send him to a different local school. My cousin says that public schools have way more resources for students who need help, say, in speech therapy, than private schools because private schools do not get state funding.

Petitioner's response, less than two hours later:

> Ok Book it its important. He doesn't know that it's good for him and its only two mornings.

> Ok go for public school for [older child]!

> Thanks for doing the research. For my next visit, where about should I look for in terms of Airbnb?

Respondent's response:

> He said it's okay. I will book.
>
> We both know it was always me who was going to do the research.
>
> Downtown Plainfield.
>
> To follow up, I've undertaken 100% of their care since they were born and am okay continuing to do so.

Petitioner's response:

> That's fine but understand that in this relationship you left very little space for me and my choices. So if you are mentally stable, that [sic] we decide on school and activities together and the kids are happy and since they have extended family there, as long as I can see them enough and spend quality time with them (we will have to talk vacations: Christmas and the summer at least) I am okay with you having the lead and the privilege of having them on your side of the ocean.
>
> But truth is I would be ready and more than happy to take care of them at 100% on my side of the ocean.

Ex. 1 at 100-101.

There are many subsequent conversations between the parties about the children touring their schools, meeting their teachers, what time they would start, and when would be the best time for Petitioner to call. *Id*. at 101-104.

Beginning on August 13, there are a series of written communications about Petitioner attempting to rent out Fernand LaFarge, a second apartment owned by the couple. *Id*. at 102. Petitioner testified during the hearing that he anticipated living in this apartment should Respondent and the children return to France to live in their marital home. Doc. 54 at 64. The communications surrounding rental of the apartment appear to have been an ongoing dialogue between the couple. There is nothing in these communications that would in any way indicate that Petitioner believed or hoped that he would be living in that apartment anytime soon. To the contrary, Petitioner expressed his desire that the apartment would be rented by September. Ex. 1 at 102.

On August 22, Petitioner filed a police report charging Respondent with "abandonment of the marital home." Ex. 2. In that police report, Petitioner told French police that Respondent had "not returned to the couple's home with their two minor children as was planned for August 21, 2024." *Id.* Petitioner also told the French police that the children were enrolled in French schools for the upcoming school year; he did not tell the police that the children were already attending school in the United States. Doc. 54 at 141.

There are also legal documents filed by Petitioner in France, which Respondent argues demonstrate Petitioner's consent to the children remaining in the United States. Most significant is the Summons for Divorce, filed by Petitioner's attorney in France. Ex. 5. In that document, the following statements appear: "[Respondent] informed [Petitioner] of her decision to stay in the

United States with the children. [Petitioner], who had been presented with a fait accompli and was now feeling very guilty about the breakdown of the marital relationship, agreed, for the sake of his wife's mental health, which was already fragile, and to avoid any conflict with her that might harm his children, that [the children] stay with their mother. This situation should, of course, be only temporary, and conditional on [Petitioner] exercising visitation rights." Ex. 5 at 9.

### *Factual Findings*

After observing the witness testimony and reviewing all of the documentary exhibits, the Court makes the following factual findings as to the disputed issues. First, it was quite clear that in the summer of 2024, Respondent was in an extremely emotionally fragile state. In a four-week period, Respondent received an anonymous letter informing her that Petitioner had repeatedly been unfaithful, Petitioner told Respondent he wanted a separation, and Respondent suffered a miscarriage. Second, it is clear that Petitioner – who described himself repeatedly as having an "avoidant attachment style" – wanted out of his marriage with the least amount of drama possible. Given all this, the Court finds it highly plausible that Petitioner told Respondent that because he was ending the marriage, she could choose where she and the children lived. This is consistent with the words and emotional tenor of the written communications between the parties, especially Petitioner's message that "I am okay with you having the lead and the privilege of having [the children] on your side of the ocean." Ex. 1 at 101.

The Court also credits Respondent's testimony that on August 1, she told Petitioner she and the children would be staying in Illinois, and he agreed. This version of events was corroborated by Mrs. Fortini's testimony about the family's August 2 conversation, which Mrs. Fortini said included a lengthy discussion about the children attending public versus private school in Illinois. Such a discussion would have been unnecessary if there was any possibility of the children returning to France on August 21. While August 6 was the first time there was any written communication about the children attending school in Illinois, there is nothing in the written communications themselves that indicates this is the first day it had been discussed. To the contrary, Respondent's discourse on public versus private school and school safety, coupled with Petitioner thanking Respondent for doing the research, supports the inference that this had been an ongoing dialogue between the couple. In those written communications, Petitioner expresses nothing but support for the children remaining in Illinois, and in fact urged Respondent to book preschool for the youngest child (who at three years old did not need to be in school at all) and used an exclamation point when responding to the message about the oldest child attending public school.

The Court does not find it credible that the first time Petitioner heard about his children staying in Illinois was via a phone call on August 6. The Court is also not persuaded that Petitioner only pretended to agree because Respondent threatened to withhold his children if he did not cooperate. Petitioner's testimony in this regard is contradicted not just by the testimony of Respondent and Mrs. Fortini, but also the written communications, which show no sign of such threats. Moreover, one would think that if Petitioner had been told on August 6 that he would not see his children again unless he cooperated with Respondent, that would have been an

8

important part of his story to the French police when he filed his August 22 police report. Instead, he told the French police that he expected his family back on August 21. That statement is at best misleading, given Petitioner's testimony before this Court that he knew since at least August 6 that Respondent did not plan to bring the children back. Also misleading was Petitioner's statement to French police that the children were enrolled in French schools for the upcoming school year, without telling the police that the children were already attending school in the United States. Petitioner testified at the hearing that he did not tell the police about the children attending school in Illinois because he "didn't know" and "had no confirmation of that." Doc. 54 at 141. This testimony was clearly untrue, given the written communications between the parties which preceded Petitioner's visit to the French police. *See, e.g.,* Ex. 1 at 103 (Petitioner: "How was school? He told me yesterday he was starting today"); *Id*. at 104 (Petitioner: "can you tell me the … school schedule?" Respondent: "both kids start school around 8:45").

The Court finds it notable that in his many hours of testimony, Petitioner did not discuss what he told his children prior to his flight on August 3. Petitioner was leaving the family vacation two weeks early and presumably had some conversation with his children before flying to France. Respondent testified that together they told the children "you live here now." Doc. 55 at 42. Given Petitioner's lack of testimony on the topic, Respondent's testimony is therefore unrebutted. Moreover, Respondent's testimony is corroborated by an August 25 text from Respondent to Petitioner in which Respondent stated: "You could have stayed a few weeks ago. You could have stayed and helped sign them up for school, for activities, for healthcare, stayed and found a psychologist for [oldest child], stayed and helped him start school. But you left in less than 24 hours after telling him that his life as he knew it was over." Ex. 1 at 110. In his response, Petitioner does not disagree with the premise that he left knowing that the children were going to need schools, activities, and healthcare in the United States. Nor does he challenge the statement that they told their oldest child about these upcoming changes. Instead, Petitioner said: "The truth is I never wanted them to stay here. I thought of you first in this instance because mentally I was stronger than you and more tolerant to the suffering of having my kids for [sic] from me and the energy and flexibility required to go back and forth the Atlantic. I would have stayed if I didn't believe it would prevent you from healing." Ex. 19.

Based upon all of the evidence, the Court concludes that on August 1 Petitioner told Respondent that she could choose where the children would live, and Respondent chose Illinois. Petitioner, who felt guilty about having caused the family emotional turmoil and believed he was in the better position to travel to see the children, agreed. The Court further concludes that on August 2, Petitioner and Respondent told their children that from that point forward the children would be living in Illinois.

## ANALYSIS

The purpose of a Hague Convention case is "to determine whether a child has been wrongfully removed or retained from his habitual residence and, if so, to order the child's prompt return." *Baz v. Patterson*, 100 F.4th 854, 865 (7th Cir. 2024). Petitioner bears the burden of proving by a preponderance of the evidence that the children have been wrongfully retained

within the meaning of the Convention. 22 U.S.C. § 9003(e)(1). Courts undergo a four-part test in making this determination:

> (1) When did the removal or retention of the child occur? (2) In what State was the child habitually resident immediately prior to the removal or retention? (3) Was the removal or retention in breach of the custody rights of the petitioning parent under the law of the State of the child's habitual residence? and (4) Was the petitioning parent exercising those rights at the time of the unlawful removal or retention?

*Baz*, 100 F.4th at 865-66. If Petitioner proves a *prima facie* case of wrongful retention, the burden shifts to Respondent to prove by a preponderance that Petitioner consented to the retention. The Seventh Circuit has described consent to apply "when a petitioning parent, either expressly or through his conduct, agrees to a removal or retention before it takes place." *Walker v. Walker*, 701 F.3d 1110, 1122 (7th Cir. 2012).

In this case, Petitioner has argued that the wrongful retention occurred on August 21, 2024, and the parties have agreed that Petitioner was at all times exercising his custodial rights. Therefore, inquiries one and four are satisfied. The first disputed issue involves inquiry two: whether the children's place of habitual residence on August 21 was France or Illinois.

Habitual residence is a fact-based, totality-of-the-circumstances inquiry. *See Monasky v. Taflieri*, 589 U.S. 68, 78 (2020). The Supreme Court has described it as being not just the place where a child is currently residing, but "the place where a child is at home," which requires "some degree of integration by the child in a social and family environment." *Id*. at 77. Among other factors, courts look to facts indicating acclimatization to a particular environment, and the intentions and circumstances of caregiving parents. *Id*. at 78.

Here, the parties agree that the oldest child had lived in France for most of his life and the youngest for his entire life, the vast majority of the children's belongings were in France, and the children were enrolled to attend school in France in the fall of 2024. At the same time, the Court has found that on August 2, Petitioner and Respondent agreed that the children would stay in Illinois indefinitely, and further told the children "you live here now." Furthermore, the evidence shows that the children had been living in their grandparents' home since August 2 and began school in Illinois in mid-August. Petitioner argues in the twenty-day period between August 2 and the retention date of August 21, the children could not possibly have become acclimatized. In support of this, Petitioner points to evidence indicating that the children were struggling with their video calls to Petitioner in which they were seeing their room and toys back in France. Petitioner further argues that even if the Court finds that Petitioner agreed to let the children stay in Illinois indefinitely, he did not agree to change their place of habitual residence.

The Court concludes that, while this is a close question, Petitioner has met his burden of showing by a preponderance of the evidence that on August 21 the children's place of habitual residence was France. The children, at three and five, were quite young, and young children acclimatize quickly. That said, in this Court's experience, a young child's home is where his toys

10

are. Given that they still had most of their belongings in their bedroom in France and that their family had resided together in France for as long as they could remember, the children were likely more at home in France than in Illinois as-of August 21. The Court therefore finds that question two has been proved in Petitioner's favor.

The Court moves on to the final, and most significant, disputed issue: whether Petitioner agreed to allow the children to live in Illinois. There is tension as to whether this dispute is best analyzed as part of Petitioner's *prima facie* case in establishing that the retention of the children was in breach of his custody rights, or whether it is better analyzed as part of a consent defense where Respondent has the burden of proof. In this particular case, Petitioner has not presented the Court with any French law that would indicate that it would be a breach of Petitioner's custody rights under French law for the children to remain in Illinois if Petitioner had agreed to let Respondent make that decision. For that reason, the Court concludes that Petitioner has failed to meet his *prima facie* case of wrongful retention by a preponderance of the evidence. As is discussed further below, however, the result in this case would be the same even if analyzed under the more onerous standard of a consent defense.

Consent is an affirmative defense to a Hague Convention petition that a respondent has the responsibility of proving by a preponderance of the evidence. 22 U.S.C. § 9003(e)(2). Consent may be shown by either express agreement or inferred from a petitioner's conduct prior to the retention. *See Walker*, 701 F.3d at 1122. This is a subjective test and should take into account any conditions or limitations that the consenting party imposed. *See Baxter v. Baxter*, 423 F.3d 363, 371-72 (3d Cir. 2005).

The Court finds that Respondent has demonstrated by a preponderance of the evidence that Petitioner consented to the children remaining in Illinois indefinitely. As is discussed at length in the factual findings above, the Court believes that Petitioner gave Respondent a choice as to where the children would live and did not voice any objections when Respondent chose Illinois. To the contrary, the Court has found that Petitioner discussed with Respondent's parents whether the children could live with them and what the best school environment was for the children. By no later than August 8, Petitioner expressed full support for the children being registered for school in Illinois. By August 13, Petitioner had fully moved forward by making plans to rent out the apartment that he would have lived in if the children were coming back to France. As he admitted in contemporaneous writings more than once, Petitioner gave this consent because he felt guilty about having ended his marriage and he believed he was more capable of being away from the children than was Respondent.

The Court has no doubt that Petitioner did not enjoy being separated from his children. To that end, the Court credits Petitioner's written statements that Petitioner would have been willing to take care of the children in France and that he would have preferred to have his children there. But the Court also believes that Petitioner, a successful businessman, recognized a lose-lose situation when he saw one: with Respondent staying in Illinois, one of them was going to have to be separated from the children. The Court believes that Petitioner was capable of making, and did make, the best choice possible under bad circumstances. Respondent had been the primary parent for the children and was more emotionally distraught by Petitioner's decision

to end the marriage. It was not only logical, but also admirable, for Petitioner to agree to let the children live with Respondent and her parents in Illinois.

At some point, likely around August 26 when Respondent prevented Petitioner from seeing his children after he flew to Illinois to visit them, Petitioner obviously changed his mind. But "the Hague Convention does not provide a mechanism for the revocation of consent once given." *Cascio v. Pace*, 992 F. Supp. 2d 856, 866 (N.D. Ill. 2014); *Gonzalez-Caballero v. Mena*, 251 F.3d 789, 794 (9th Cir. 2001) ("Under the Hague Convention's plain, unambiguous language, consent before the removal and retention . . . extinguishes the right of return."). Thus, Petitioner's unhappiness with the current state of events does not provide the evidence needed to support his petition.

The Court is also not persuaded by Petitioner's arguments that, to the extent he consented, the consent was predicated on Respondent engaging in marital counseling and Petitioner having daily calls with the children, and that when Respondent breached these agreements any consent was vitiated. As a preliminary matter, the Court saw no evidence that Petitioner was seriously interested in marital counseling. *See, e.g.,* Doc. 34 at 22 ("Petitioner admits that, a few days later, during a virtual couples counseling session, he told her that he wanted a divorce."). The Court does believe that Petitioner wanted to keep in close contact with his children. However, the Court has not seen any evidence that Petitioner's desire was enough to create a conditional agreement between him and Respondent. In any event, the record supports that Petitioner had frequent contact with his children, with at least four video calls between August 15 and August 18. Ex. 1 at 104, 105, 106, 107. Prior to this, the children had been on a one-week trip to the Ozarks, during which video calls were presumably difficult, and Respondent had offered Petitioner another opportunity to speak with the children, which he seems to have declined. *See, e.g.*, Ex. 1 at 103 ("[the youngest child] is sleeping. [the oldest child] says he doesn't feel like talking. Do you want me to give him the phone anyway?"). Thus, even if the Court found that Petitioner's consent was conditional (which it does not), the Court would not find that the condition was breached by Respondent prior to August 21, the alleged date of wrongful retention.[2]

The Court concludes that Petitioner voluntarily agreed to allow his children to live in Illinois with Respondent. Therefore, Respondent's retention of the children was not wrongful. Even if the facts were analyzed under the more rigorous standards of a consent defense under Article 13 of the Hague Convention, Petitioner cannot prevail.

## CONCLUSION

For the foregoing reasons, the Court concludes that Petitioner has not met his burden of establishing that he is entitled to relief under the Hague Convention or ICARA. This petition is dismissed, with prejudice.

---

[2] Respondent did prevent Petitioner from seeing his children August 26 – August 28, 2024. As this occurred after the alleged date of wrongful retention, it is not relevant to the analysis as to whether any supposed-agreement between the parties was breached prior to August 21.

Dated:  February 25, 2025.

United States District Judge